1 | JOHN WALSHE MURRAY (074823)
JANICE M. MURRAY (099996)
2 | ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
3 | MURRAY & MURRAY
A Professional Corporation
4 | 19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
5 | Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
6 | email: jwmurray@murraylaw.com
email: jmmurray@murraylaw.com
7 | email: rfranklin@murraylaw.com
email: dkaelin@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | |
| **REDENVELOPE, INC.,** | Case No. 08-30659-DM-11 |
| Debtor. | Chapter 11 |
| 149 New Montgomery Street<br>San Francisco, CA 94105 | Date: April 22, 2008<br>Time: 11:00 a.m.<br>Place: 235 Pine Street, 22nd Floor<br>San Francisco, CA 94104 |
| Employer Tax I.D. No.: 33-0844285 | Judge: The Honorable Dennis Montali |

**MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR**

## TABLE OF CONTENTS

Page

I. Summary Of Sale And Relief Sought ...................................................................................... 1
II. Background Summary .............................................................................................................. 2
III. The Motion ............................................................................................................................... 5
    A. Bidding Procedures ........................................................................................................... 5
    B. Breakup Fee and Expense Reimbursement ....................................................................... 9
IV. Argument ................................................................................................................................ 11
    A. This Court Should Approve the Proposed Sale Procedures Because the Procedures Are Fair, Reasonable And In The Best Interests of Debtor's Estate. ............................. 11
    B. Provisions for Notice and Objection Dates ..................................................................... 14

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*In re 995 Fifth Avenue Associates, L.P.*,
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) .................................................................................. 12

*In re America West Airlines, Inc.*,
    166 B.R. 908 (Bankr. D. Ariz. 1994)(concluding that the standard is not whether a
    break-up fee is within the business judgment of the debtor, but instead, whether the
    transaction will "[f]urther the diverse interests of the debtor, creditors and equity
    security holders alike") ..................................................................................................... 12

*In re APP Plus, Inc.*, 223 B.R. 870 (Bankr. E.D.N.Y.. 1998) ................................................ 13, 16

*In re Bethlehem Steel Corp.*,
    2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. 2003), quoting 3 Collier on Bankruptcy
    § 363.03 [7] (15th ed. 2002) ............................................................................................. 12

*Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy Inc.*,
    181 F.3d 527 (3d Cir. 1999) .............................................................................................. 13

*In re Hupp Industrial*,
    140 B.R. 191 (Bankr. N.D. Ohio 1992) ............................................................................ 12

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*,
    147 B.R. 650 (S.D.N.Y. 1992) .......................................................................................... 12

*In re Quintex Entertainment, Inc., et al*,
    950 F.2d 1492 (9th Cir. 1991) .......................................................................................... 11

## FEDERAL STATUTES

11 U.S.C. § 363 ............................................................................................................................ 1, 9

RedEnvelope, Inc., a Delaware corporation, the debtor and debtor-in-possession herein (the "Company," or the "Debtor"), moves this Court for entry of an order approving certain sale procedures in connection with the proposed sale of substantially all of the Debtor's assets to Creative Catalogs Corporation, a Delaware corporation, or its designated affiliate ("Buyer" or "CCC").

This motion (the "Motion" or "Sale Procedures Motion") is made pursuant to 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004. This Motion is supported by the DECLARATION OF PHILLIP E. NERI IN SUPPORT OF FIRST DAY MOTIONS (the "Omnibus Declaration") and will be based on such other evidence and argument as may be presented at the hearing on the Motion.

## I. SUMMARY OF SALE AND RELIEF SOUGHT

1. In early April, the Company was contacted by Creative Catalogs Corporation, a Delaware corporation ("CCC") who indicated an interest in becoming the stalking horse bidder. On April 13, 2008, the Company signed a Letter of Intent (the "LOI") with CCC for the sale of substantially all of the Company's assets (the "Acquired Assets") and post-petition secured financing, conditioned upon CCC being selected as the "stalking horse bidder" with certain bid protections. Execution of the LOI by CCC was predicated upon the mailing by the Company of its Mothers' Day catalog on April 14, 2008 which occurred. On April 17, 2008, immediately before the filing of this Chapter 11 case, the Debtor executed a definitive Asset Purchase Agreement (the "Purchase Agreement") with CCC. A copy of the Purchase Agreement is attached to the Omnibus Declaration as Exhibit "A."

2. The Purchase Agreement provides for the sale (the "Sale") of substantially all of the assets of the Debtor excluding cash, certain contracts and causes of action and other assets as specified in the Purchase Agreement, together with the assumption and assignment of certain specified executory contracts and unexpired leases of the Debtor. Except as provided by the Purchase Agreement, the sale of the Acquired Assets is be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowable by law.

3. The Purchase Agreement provides for a purchase price of $5,700,000 cash (the

"Purchase Price"), less a closing inventory adjustment[1] and less the amount owed by the Debtor under the DIP facility extended by CCC. The Debtor is responsible for cure costs for executory contracts and leases included in the transaction which the Debtor estimates at approximately $275,000.

4. The Purchase Agreement includes certain contingencies, including adherence to certain deadlines such that the Sale may close no later than May 30, 2008.

5. By this Motion, the Debtor seeks approval of certain sale procedures including the terms and conditions of any competing bids and the payment of a breakup fee and reimbursement of actual out-of-pocket costs and expenses incurred by CCC, in the event that the Acquired Assets are sold to another party for more than the Purchase Price or the Debtor proceeds with a plan of reorganization that is inconsistent with the transaction contemplated by the Purchase Agreement.

6. Pursuant to this Motion, the Debtor also requests that the Court specially set the hearing (the "Sale Hearing") on the motion to approve the sale of the Assets free and clear of liens and encumbrances (the "Sale Motion") so that the Sale may close on or before May 30, 2008 as required by the Purchase Agreement. In connection with the Sale, the Debtor also requests that the Court specially set for the same date and time the hearing on the Debtor's motion to approve the assumption and assignment of executory contracts and leases to be included in the transaction (the "Assumption Motion").

## II. BACKGROUND SUMMARY

1. On April 17, 2008 (the "Petition Date"), the Debtor filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code and is presently operating its business as a debtor in possession under 11 U.S.C. §§ 1107 and 1108.

2. No official committee of unsecured creditors ("Committee") has been formed in the bankruptcy case to date.

---

[1] Pursuant to the Purchase Agreement, the Debtor and CCC will take a physical inventory at the closing of the Sale (the "Closing Date Inventory"). For each dollar in which the usable inventory is less than $8,200,000, the non-usable inventory is less than $400,000, or the gift wrap inventory is less than $600,000, the cash consideration paid by CCC will be reduced dollar for dollar (such amount being referred to as the "Closing Inventory Adjustment"). The Purchase Agreement does not provide for an upward adjustment if the Inventory in any category is more than the Closing Date Inventory. The book value of the inventory and Closing Date Inventory is to be determined in accordance with the Company's historical practices. CCC may waive the requirement for a physical inventory in its discretion.

3. The Debtor is a branded online and catalog retailer of upscale gifts. It was incorporated in California in June 1997 under the name "Giftworks Online, Inc." and changed its name to "911 Gifts, Inc." in December 1997. The Company was reincorporated in the state of Delaware under the name "911 Gifts, Inc." in March 1999 and changed its name to "RedEnvelope, Inc." in September 1999.

4. The Debtor is a public company listed on the pink sheets quotation service[2] In the third quarter of fiscal year 2008, the Debtor's net revenues decreased 20.7% from $57.0 million in the third quarter of fiscal year 2007 to $45.2 million in the third quarter of fiscal year 2008. Gross margin decreased in the third quarter of fiscal 2008 to 48.7% from 54.1% in the third quarter of fiscal year 2007. The Debtor's net loss for the third quarter of fiscal 2008 was $4.3 million compared to net income of $5.3 million in the same period of the prior fiscal year. Although the Debtor experienced an increase in the average unit retail price and the average revenue per order shipped decreased only slightly, it experienced a 40.9% decrease in new customer acquisitions and a 19.6% decrease in the number of orders shipped as compared to the same period in the prior year. The decline in orders shipped in the third quarter of fiscal 2008 resulted from a decline in customer response rates as compared to the same period in the prior year, as well as a reduction in marketing expenditures for new customer prospecting in the second half of fiscal 2007.

5. In its SEC Form 10 Q filed for the quarter ending December 30, 2007, the Company reported that the cash then on hand and the cash available to it through a revolving credit facility with Wells Fargo (the "Wells Fargo Facility") would be sufficient to continue operations through the quarter ending June 29, 2008, based on historical working capital needs, operating loss trends, and current business outlook as well as based on discussions with Wells Fargo. The Debtor also reported that beyond the quarter ending June 29, 2008, it would need to obtain equity and or additional debt financing to fund operations and capital expenditures. The Company reported that management was

---

[2] Currently, the Debtor has compiled the names of the stockholders holding approximately 89% of the outstanding stock of the Company comprised of the NOBO list with record date of 2/28/08: 785 shareholders holding 3,052,197 shares (including Integrity Brands with 943,858 shares) and the list of holders of 5% or more shares (excluding Integrity Brands): 5 shareholders holding 5,438,772 shares. For purposes of providing notice of the Sale Hearing, the Debtor requests that the Court limit notice to those stockholders currently known (representing 89% of the outstanding stock)(the "Equity Holders").

aggressively reviewing options to obtain additional financing and multiple discussions were underway with a variety of potential partners.

6. In addition and/or in conjunction with these financing efforts, the Company began soliciting potential acquirers. It retained Triangle Capital LLP, an investment banker, and a special committee of the board of directors was formed to evaluate bids and report to the board.

7. On March 28, 2008, Wells Fargo abruptly withdrew the credit facility,[3] citing its assessment of substantially lower inventory valuations and increased reserves. This sudden development derailed the Company's orderly exploration of various strategic alternatives that included contact with numerous potential merger and acquisition candidates, several of whom had executed confidentiality agreements and conducted due diligence.

8. The Debtor has been in contact with various companies who might have an interest in acquiring the Assets which efforts will continue in the coming weeks. Establishment of the sale procedures will formalize this process and assist in the Debtor's efforts to encourage diligence by possible acquirers.

9. The Buyer requires that the closing of the Sale occur by May 30, 2008 because of the seasonal nature of the business. The Debtor believes that other potential bidders will likewise require a closing date in the same time frame. The Debtor commenced exploration of a merger or acquisition candidate through an investment banker and direct efforts as early as January 2008. Multiple parties executed confidentiality agreements and initiated diligence. The Debtor has a data room established for prospective bidders. The Debtor believes that it has identified those persons who could be interested in presenting an overbid, all of whom will be provided notice of the hearing on this Motion and all sale-related motions. The Debtor believes that an expedited sale process is necessary to promptly institute its improved business plan and that the Sale is in the best long-term interest of the Debtor's customers, partners, vendors and employees. Accordingly, the Debtor requests a special setting of the Sale Hearing in order that the Debtor can provide regular notice of the hearing on the Sale Motion and the Assumption Motion such that the closing may occur on or

---

[3] The Company did not have an outstanding balance at the time of the termination under the Wells Fargo Facility.

before May 30, 2008.

10. In addition to creating a source of recovery for other creditors by conducting a sale of the Company's assets as a going concern and subject to overbid, the proposed sale provides additional benefit to creditors in that it is contemplated that a number of the Debtor's contracts pertaining to the assets to be acquired will be assumed and assigned to the Buyer in conjunction with the Sale, which is anticipated to reduce the overall claims against the Debtor. The proposed sale to Buyer is anticipated to provide the best opportunity for a return to creditors by realizing a sale of substantially all of the Debtor's assets as a going concern.

### III. THE MOTION

#### A. Bidding Procedures.

11. As an inducement to the Buyer to agree to enter into the Purchase Agreement subject to third party diligence and bidding, and in order that the sale process will not be delayed by last minute offers, the Debtor believes that the Court should establish a competing bid procedure concerning bids by any other prospective buyers. The Debtor submits that the proposed competing bid procedure described herein below is reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Assets for the Debtor's Chapter 11 estate.

12. The Debtor proposes the following competing bid procedures ("Bidding Procedures") for persons wishing to present a competing offer with respect to the Acquired Assets:[4]

   i. By 5:00 p.m. prevailing Pacific Time on **[the third business day before the Sale Hearing]** (the "Bid Deadline"), any bidder other than CCC ("Competing Bidder") must submit its competing bid in providing for an all cash purchase price ("Competing Bid") of an amount that is at least $500,000 greater than the sum of the Purchase Price, the Breakup Fee, and the Expense Reimbursement (the "Initial Competing Bid"). A higher bid will not be considered by Debtor as qualified for the Auction if (A) such bid contains financing or due diligence contingencies of any kind; (B) such bid is not received by the Bid Deadline; or (C) such bid does not contain evidence that the person submitting it has received debt and/or equity funding commitments or available cash

---

[4] Persons meeting the requirements set forth below will be deemed a "Qualified Bidder."

sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than $100,000 in cash.

    ii. The Competing Bid must be in writing setting forth all material terms and conditions of the Competing Bid, and be addressed to the following persons (the "Notice Parties"):

<u>Debtor</u>:
RedEnvelope, Inc.
149 New Montgomery Street
San Francisco, California 94105
Attn: Phillip E. Neri, CFO
Facsimile: (415) 371-1134
**Email: pneri@redenvelope.com**

<u>With a copy to Debtor's special corporate counsel</u>:
Christopher M. Forrester, Esq.
Morrison & Foerster LLP
12531 High Bluff Drive
San Diego, CA 92130
Facsimile: (858) 720-5125
**Email: cforrester@mofo.com**

<u>With a copy to Debtor's bankruptcy counsel</u>:
John Walshe Murray, Esq.
Murray & Murray, A Professional Corporation
19400 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014
Facsimile: (650) 852-9244
**Email: jwmurray@murraylaw.com**

<u>With a copy to counsel for the Creditors' Committee</u>:
[TBD]

<u>With a copy to counsel for CCC</u>:
Michael H. Ahrens, Esq.
Shepperd Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Facsimile: (415) 434-3947
**Email: mahrens@sheppardmullin.com**

    Upon receipt of any Competing Bid, Debtor's counsel shall also provide a copy of the Competing Bid to any other bidders, and if requested, to the Office of the United States Trustee.

    iii. The Competing Bid must be accompanied by the executed form of the written agreement that the Competing Bidder requires the Debtor to execute in connection with the

acquisition (the "Competing Bidder Agreement"), together with a blacklined version to reflect any proposed changes to the terms and conditions of the revised Purchase Agreement;

        iv.    A Competing Bid must be accompanied by a good faith cash deposit in the form of a cashier's check made payable to "RedEnvelope, Inc." in an amount of not less than $100,000 which will be credited towards the Purchase Price if the Sale is completed with the Competing Bidder making the deposit;

        v.    In the event of the approval of the Competing Bid, such Competing Bidder's deposit shall become non-refundable if (a) the Competing Bid is accepted, (b) the Competing Bidder fails to close if and as required by the terms of such Competing Bid, and (c) the Debtor is otherwise ready, willing and able to close under the Competing Bid and is not in default under the Competing Bid. If the Debtor closes a sale of the Acquired Assets to another Competing Bid or CCC, the deposit will be refunded within three (3) business days of such closing. In the event a dispute arises over whether a deposit is refundable or non-refundable, the Debtor shall hold the deposit pending a determination of the issue by the Court or written agreement of the Debtor and the Competing Bidder who made the deposit;

        vi.    If the Competing Bidder is an entity formed for the purpose of acquiring the Acquired Assets, the Competing Bidder shall also provide to the Debtor current audited financial statements or other evidence satisfactory to the Debtor and any Creditors' Committee and their respective advisors of the equity holder(s) of the bidder who shall guarantee the obligation of the bidder or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor and the Creditors' Committee;

        vii.    Simultaneous with submission of the Competing Bid, the Competing Bidder must (A) provide to the Debtor reasonably satisfactory evidence of its financial ability to fully and timely consummate the sale on the terms of the Competing Bid; and provide adequate assurance of future performance of all contracts and leases to be assigned; (B) disclose any connections or agreements with the Debtor and/or any officer, director or equity holder of the Debtor; and (C) confirm in writing its agreement to accept and abide by the terms, conditions and procedures of the Bidding Procedures;

viii. In the event either CCC's offer or a Competing Bid is approved, but not consummated by May 30, 2008 (or such later date as the Debtor and CCC or the Competing Bidder shall mutually agree in writing), the Debtor will request that the next highest bid be approved (with that bidder's agreement to serve as a back-up bid) without the necessity of further Court order;

ix. If a proper Competing Bid is timely submitted, then an Auction shall be held at the Sale Hearing before the Honorable Dennis Montali, United States Bankruptcy Court, 235 Pine Street, Floor 22nd Floor, San Francisco, California 94104 upon notice to all prospective bidders. Bidding increments shall be not less than $100,000 higher than the prior offer, provided that each Competing Bid shall be in cash in an amount not less than the Initial Competing Bid; provided, however, that any overbid by CCC shall only be required to be equal to the sum of (A) the then existing lead bid plus (B) $100,000 less (C) the dollar value of the Breakup Fee and Expense Reimbursement;

x. At the Auction, CCC and Competing Bidders shall have the right to: (A) submit further bids, along with a markup of the Purchase Agreement, provided they participate in each round of bidding (in other words, in order to make further bids, the bidder must participate in each round of bidding), and (B) at any time, request that the Debtor announce, subject to any potential new bids, the then current highest or best bid and, to the extent CCC or any Competing Bidder requests, use reasonable efforts to clarify any and all questions CCC or Competing Bidder may have regarding Debtor's announcement of the then current highest or best bid;

xi. Prior to receipt by a prospective bidder of any non-public information (including, without limitation, business and financial non-public information and access to representatives of the Debtor) from the Debtor, Competing Bidders will be required to execute an appropriate non-disclosure or confidentiality agreement;

xii. No Competing Bidder shall be entitled to any expense reimbursement, breakup, or termination or similar fee or payment;

xiii. Unless otherwise agreed by CCC, only Qualified Bidders, CCC, Debtor's pre-petition and post-petition lenders, any Creditors' Committee, and the United States Trustee may participate in the auction;

xiv. Any party in interest other than a bidder shall have standing to challenge any prospective bidder's compliance with these qualification requirements. Any dispute regarding a prospective bidder's compliance with the qualification requirements established by this Order shall be resolved by the Bankruptcy Court at the Auction;

xv. The Debtor may not contest any argument by CCC that it has standing to contest the highest or best bid selected by the Debtor;

xvi. The Debtor, in consultation with any Creditors' Committee, reserves the right to adopt additional rules for bidding at the Sale Hearing that, in their judgment, will better promote the goals of the bidding process and that are not inconsistent with any provisions of this Order; and

xvii. Upon conclusion of the Auction, the Debtor in consultation with any Creditors' Committee, shall review the Qualified Bid(s) on the basis of among other things, the following: (a) the amount of the Qualified Bid(s), (b) the form of the proposed transaction (i.e., any improvement in the terms set forth in the Purchase Agreement), (c) the number, type and nature of any changes to the Purchase Agreement, (d) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to the Debtor of such modifications or delay; (e) the likelihood of the bidder's ability to close a transaction and the timing thereof, (f), and (g) the net value provided to the Debtor, taking into account CCC's right to the Breakup Fee and Expense Reimbursement Expense, and such other aspects as determined by the Debtor and any Creditors' Committee, and shall submit the highest or otherwise best bid for approval by the Court pursuant to Section 363 of the Bankruptcy Code.

13. In the event the Debtor is unable to obtain Court approval of the Sale Motion or otherwise tender performance to any bidder, the sole remedy of any such bidder (other than CCC whose rights are established by the Purchase Agreement) shall be the return of its deposit.

14. The foregoing auction procedures shall be without prejudice to the rights of CCC to make a credit bid pursuant to section 363(k) of the Bankruptcy Code at the Auction based on the portion of the DIP Amount due and payable to CCC as of the Auction.

**B.  Breakup Fee and Expense Reimbursement.**

15. The Purchase Agreement provides for a breakup fee equal to five percent (5%) of the

Purchase Price (the "Breakup Fee") and entitles CCC to be reimbursed for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by CCC in connection with the Bankruptcy Case and the negotiation, execution and delivery of the Purchase Agreement up to an aggregate amount of two percent (2%) of the Purchase Price (the "Expense Reimbursement")." Section 11.2 of the Purchase Agreement sets forth the following circumstances in which payment is required:

> 11.2  Breakup Fee and Expense Reimbursement.
>
> (a)  Upon the first to occur of (i) the date Seller consummates an Alternative Transaction or (ii) following approval of the Bidding Procedures Order, on the date Seller files a chapter 11 plan contemplating the sale or retention of the Acquired Assets by Seller in a manner substantially inconsistent with the terms of this Agreement, Seller shall immediately pay (in cash) to Purchaser the Breakup Fee and Expense Reimbursement, which shall constitute an administrative expense, which shall be a super-priority administrative expense claim senior to all other administrative expense claims of Seller under section 364(c)(1) of the Bankruptcy Code.

16.  Separately, the Debtor and CCC shall be entitled to payment of $108,000 in cash from the other if either terminates the Purchase Agreement as a result of a material breach or misrepresentation of the representations and warranties by the other party, provided that the terminating party is not in material breach of the Purchase Agreement pursuant to the Purchase Agreement (the "Termination Damages"). CCC is required to deposit $108,000 in escrow for such purpose pursuant to the terms of the Purchase Agreement.[5] In the event CCC is entitled to the Break

---

[5] Section 11.2(b) of the Purchase Agreement provides the following with respect to the Termination Damages:

"(b)  If Purchaser terminates this Agreement pursuant to Section 11.1(c) as a result of a material breach or default by Seller and Purchaser is not in material breach of this Agreement, Seller shall pay to Purchaser $108,000 in cash as complete liquidated damages hereunder, such payment to constitute a super-priority administrative obligation of Seller under section 364(c)(1) of the Bankruptcy Code. In no event shall Purchaser be entitled to receive payment under both this Section 11.2(b) and Section 11.2(a).

(c)  Within three (3) Business Days of the signing of the Agreement, Purchaser shall deliver $108,000 to an escrow agent to be mutually agreed upon by Purchaser and Seller (the "Escrow Agent"). Upon termination of the Agreement by Seller pursuant to Section 11.1(c) as a result of a material breach or default by Purchaser, and provided Seller is not in material breach of this Agreement, within three (3) Business Days following such termination, Purchaser and Seller shall execute joint written instructions to the Escrow Agent instructing the Escrow Agent to pay such funds to Seller as complete liquidated damages

Up Fee and Expense Reimbursement or the Termination Damages (in no event will CCC receive both), such obligations will constitute a super-priority administrative expense claim senior to all other administrative expense claims of the Debtor under section 364(c)(1) of the Bankruptcy Code.

17. The Debtor believes that the foregoing Bidding Procedures and the Breakup Fee, Expense Reimbursement or Termination Damages are fair, reasonable, and are appropriately structured to ensure that the Debtor will obtain the best offer for the Acquired Assets. The proposed overbid procedures allow the Debtor to maximize the value of the Acquired Assets while also ensuring that (a) only legitimate overbids are received from entities interested in purchasing Debtor's interest in the Acquired Assets; and (b) any overbid is sufficient to cover the Breakup Fee and Expense Reimbursement required to be paid to CCC if an overbid is accepted and the sale consummated. The Debtor further believes, in its reasoned business judgment, that the proposed sale (subject to the Bidding Procedures) is in the best interests of the estate and creditors because it will maximize the value of the Debtor's assets.

## IV. ARGUMENT

**A. This Court Should Approve the Proposed Sale Procedures Because the Procedures Are Fair, Reasonable And In The Best Interests of Debtor's Estate.**

18. Bankruptcy Code § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing. See, e.g., In re Quintex Entertainment, Inc., et al, 950 F.2d 1492, 1495 (9th Cir. 1991). In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction. See Fed. R. Bankr. P. 6004(f)(1). Here, the Debtor believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

---

hereunder. In the absence of such breach or default, Purchaser shall be entitled to receive all such funds from the Escrow Agent upon the Closing.

(d) Each of the parties' obligations to make payments pursuant to this Section 11.2 shall survive termination of this Agreement, other than in an instance in which this Agreement is terminated as a result of the Bankruptcy Court's failure to approve the Bidding Procedures Order (for reason other than Seller's breach of an obligation under this Agreement)."

19. Sellers of assets often employ bidding protections in order to encourage the making of bids. Break-up fees and other arrangements, such as those proposed here, are "important tools to encourage bidding and to maximize the value of the debtor's assets." Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992).

20. Historically, bankruptcy courts have approved bidding incentives similar to the Breakup Fee and Expense Reimbursement under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (establishing three basic factors for determining whether to permit break-up fees in bankruptcy: whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable relative to purchase price"), *appeal dismissed on jurisdictional ground*, 3 F.3d 49 (2d Cir. 1993); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); but see, In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994)(concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether the transaction will "[f]urther the diverse interests of the debtor, creditors and equity security holders alike").

21. "It has become increasingly common in Section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. 2003), quoting 3 Collier on Bankruptcy § 363.03[7] (15th ed. 2002). Courts which limit or deny such break-up fees do so not because they lack statutory authority, but because they find the fee or

amount is not in the best interests of the various parties and/or the estate. Id.; see also In re APP Plus, Inc., 223, B.R. 870 (Bankr. E.D.N.Y. 1998); Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy Inc., 181 F.3d 527 (3d Cir. 1999).

22. The Debtor believes (i) that the combined Breakup Fee and Expense Reimbursement not to exceed in the aggregate 7% of the Purchase Price is reasonable given the amount of the Purchase Price, the benefits to the estate of having a definitive agreement and the risk to Buyer that a third-party offer ultimately may be accepted, and (ii) that the Breakup Fee, Expense Reimbursement and Bidding Procedures are necessary to preserve and enhance the value of the Debtor's estate.

23. The Breakup Fee and Expense Reimbursement are the product of good faith, arm's-length negotiations between the Debtor and CCC. Other than the Purchase Agreement and DIP Agreement, there is no material relationship between the Debtor and CCC. No director or officer of the Debtor was a director or officer of CCC or vice-versa.

24. The Breakup Fee and Expense Reimbursement are fair and reasonable in amount, particularly in view of Buyer's efforts to date, and the risks associated with being a "stalking horse." The Breakup Fee and Expense Reimbursement benefit the estate because they assist in maximizing the value to the estate by facilitating a sale of the Debtor's business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of Buyer's offer. See Calpine Corp. v. O'Brien Env'tl Energy, Inc. (In re O'Brien Env'tl Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (finding benefit to the estate where "assurance of a break-up fee promoted more competitive bidding").

25. The Debtor does not believe that the amount of the combined Breakup Fee and Expense Reimbursement are so substantial so as to chill other potential bidders from submitting competing bids. Rather, the capped amount is reasonable compared to the total consideration under the Purchase Agreement and will only be paid if the assets are sold to a Competing Bidder necessarily providing greater value for the Acquired Assets. Even in the absence of the Breakup Fee and Expense Reimbursement, an incremental amount would be appropriate to assure that the Debtor is dealing with only serious bidders with the financial ability to complete a transaction without delay.

26. Further, the Breakup Fee and Expense Reimbursement have arguably already

Case: 08-30659 Doc# 14 Filed: 04/18/08 Entered: 04/18/08 15:57:51 Page 16 of 20

K:\RedEnvelope\Pld\Mot-Sale Proc\MotionApproveSaleProc8.doc 15 MOTION FOR ORDER APPROVING BIDDING PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

encouraged competitive bidding, in that the Buyer would not agree to negotiate and execute the Purchase Agreement without this provision. The Topping Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537. Similarly, Buyer's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." Id. Finally, the mere existence of the Breakup Fee and Expense Reimbursement permits the Debtor to insist that competing bids for the Debtor's assets be sufficiently higher than that being offered by Buyer, a clear benefit to the Debtor's estate.

27. Protection of opening bidders is the price paid for a debtor's enjoyment of the best of both worlds - the assurance of a contractually bound purchaser at a fair price, on the one hand, and at the same time the potential of an even better bid with the corresponding enhanced benefit to the estate. The Debtor's ability to offer the Breakup Fee and Expense Reimbursement enables it to ensure the sale of the Debtor's assets to a contractually-committed bidder. Under the circumstances, the Debtor believes the Breakup Fee and Expense Reimbursement (capped in the aggregate at 7% of the Purchase Price) are reasonable and should be approved.

**B. Provisions for Notice and Objection Dates.**

28. In furtherance of the Sale, the Debtor requests that the Sale Hearing be scheduled by the Court on regular notice so as to allow the Sale to close by May 30, 2008 as required by the Purchase Agreement. In connection therewith, the Debtor requests that the Court establish certain objection deadlines including the date by which persons must object to the Debtor's proposed "cure" amounts in connection with the proposed assumption and assignment of executory contracts and unexpired leases.

29. **Notices**

i. **Bid Procedures and Sale Motion**. The Debtor will cause, by twenty-eight days before the Sale Hearing, service by first class mail of the notice of the Sale (including the Bidding Procedures approved by the Court) on all known creditors, the Equity Holders, all non-debtor parties to non-residential real property leases, equipment leases and executory contracts proposed to be assumed and assigned under the Purchase Agreement (collectively, the "Assumed

Contracts") (the foregoing service list collectively referred to herein as the "<u>Global Service List</u>").

    ii. **<u>Assumption Motion.</u>** In connection with the Sale Motion, the Debtor will seek authority to assume and assign to the Buyer or any successful Competing Bidder at the Auction, the Assumed Contracts pursuant to the Purchase Agreement. The Debtor seeks authority to file with the Court and serve on the Global Service List a notice (the "<u>Assumption Notice</u>") of the Debtor's intention to assume and assign the Assumed Contracts of the non-debtor parties. The Assumption Notice with an attached schedule setting forth the cure amounts as determined by the Debtor (the "<u>Cure Amounts</u>") shall be served by first class mail twenty-eight days before the Sale Hearing.

30. **<u>Moving Papers (Bid Procedures, Sale Motion and Assumption Motion).</u>** Following approval of this Motion, the Debtor shall cause, not less than twenty (20) days before the Sale Hearing, service of the pleadings in support of the Sale Motion (which shall include as exhibits, the Purchase Agreement and the Bidding Procedures approved by the Court), the Assumption Motion, and all declarations in support thereof, by first class mail upon (a) the Office of the United States Trustee for the Northern District of California, San Jose Division; (b) counsel for the Buyer; (c) the Creditors' Committee and its counsel; (d) counsel for all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other property interest in or upon the Debtor or its Assets; (e) all parties that have expressed a bona fide interest in acquiring the Assets or that the Debtor believes may be interested in proposing a competing bid upon assets of the Company; (f) the Internal Revenue Service; (g) all entities who have filed a notice of appearance and request for service of papers in these cases and (h) all non-debtor parties to the Assumed Contracts.

31. **<u>Objection Bar Dates</u>**

    i. **<u>To Asset Sale.</u>** The Debtor requests, pursuant to Fed. R. Bankr. P. 9014, that objections, if any, to the Sale, must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, San Francisco Division, 235 Pine Street, 19th Floor, San Francisco, California 94104, on or before **[fourteen days before the Sale Hearing]**, and (d) be served no later than **[fourteen days before the Sale Hearing]** upon (1) Debtor's counsel, John Walshe Murray of Murray & Murray, A Professional Corporation, 19400 Stevens Creek Boulevard,

Suite 200, Cupertino, California 95014, facsimile (650) 852-9244, email: jwmurray@murraylaw.com; (2) counsel for the Creditors' Committee (if any); (3) counsel for CCC, Michael H. Ahrens of Shepperd Mullin Richter & Hampton LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111, facsimile (415) 434-3947, email: mahrens@sheppardmullin.com; and (4) the Office of the United States Trustee, 235 Pine Street, Suite 700, San Francisco, California 94104, facsimile (415) 705-3379 (the foregoing are collectively referred to as the "Service Parties").

ii. **To Assumption and Cure Amounts**. The Debtor further requests that the non-debtor parties to the Assumed Contracts have until the fourteenth day before the Sale Hearing (the "Cure Bar Date") to object either (a) to the assumption and assignment of any of the Assumed Contracts, or (b) to the amount of the Cure Amounts, or (c) to assert that non-monetary defaults, conditions or pecuniary losses or other amounts must be cured or satisfied (including all compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts) under any of the Assumed Contracts in order for such Assumed Contracts to be assumed and assigned. Such party must file and serve an objection upon the Service Parties (the "Assumption and/or Cure Objection") setting forth (i) the basis for the objection (non-monetary or otherwise), and, if applicable, (ii) the amount the party asserts as the cure amount and/or the amount of all compensation for any actual pecuniary loss resulting from a default in respect of the Assumed Contracts (with appropriate documentation in support thereof). If no objection is received by the Cure Bar Date, the Cure Amounts attached to the Assumption Notice shall be controlling as to the amount necessary to be paid to cure under § 365(b)(1)(A) and (B) notwithstanding anything to the contrary in any Assumed Contract or other document, and the non-debtor party to the Assumed Contract shall be forever barred from asserting any claims for the Cure Amount against the Debtor, the Buyer or such other purchaser of the Assets through the effective date of the assumption and assignment in respect of such Assumed Contract, and each party to any Assumed Contracts shall be deemed to have consented to the assumption and assignment of the Assumed Contract to CCC or any other purchaser of the Acquired Assets.

iii. Notwithstanding anything herein to the contrary, if any non-debtor party to an Assumed Contract is not satisfied with the showing of adequate assurance of future performance by

K:\RedEnvelope\Pld\Mot-Sale Proc\MotionApproveSaleProc8.doc  20  16  MOTION FOR ORDER APPROVING SALE PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

Case: 08-30659  Doc# 14  Filed: 04/18/08  Entered: 04/18/08 15:57:51  Page 19 of

any Competing Bidder by the Sale Hearing, than the non-debtor party shall have the right to raise that objection to the Assumption Motion at the time of the Sale Hearing.

**WHEREFORE**, the Debtor respectfully requests that the Court enter its order:

1. Granting the Motion;

2. Approving the Bidding Procedures and the Breakup Fee, Expense Reimbursement and Termination Damages as set forth herein;

3. Scheduling the hearing on the Sale Motion and the Assumption Motion for a date that will allow the Sale to close on or before May 30, 2008;

4. Establishing the Cure Bar Date and the deadline for objections to the Sale Motion and the Assumption Motion for the fourteenth day before the Sale Hearing; and

5. For such other and further relief as the Court deems appropriate.

Dated: April 18, 2008

**MURRAY & MURRAY**
A Professional Corporation

By: /s/ DORIS A. KAELIN
Attorneys for Debtor